WILLIAM BLAGG *et al.*, Plaintiffs-Appellees and Cross-Appellants and Fourth-Party Defendants, v. F.W.D. CORPORATION *et al.*, Defendants-Appellants (Insurance Company of North America, Intervening Petitioner-Appellant and Cross-Appellee).

Second District    No. 2—92—1355

Opinion filed July 20, 1994.

Francis William Golden, of Modest, Reynolds & McDermott, of Chicago, for appellants.

James J. DeSanto, of DeSanto & Bonamarte, P.C., of Libertyville, for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

Petitioner, Insurance Company of North America, appeals from an order of the circuit court of Lake County which found that the allocation of settlement proceeds in equal amounts between plaintiffs, William Blagg (Bill) and Marilyn Blagg, was made in good faith. Petitioner asserts the trial court applied an incorrect standard and abused its discretion in reaching its conclusion.

This is the second time the parties have appeared before us regarding this matter. The underlying facts here are the same as those fully set forth in the prior case before this court, *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1989), 186 Ill. App. 3d 955 (*Blagg I*). Therefore, we will repeat the facts only to the extent necessary to resolve the issue raised in this appeal.

Bill Blagg was injured on October 2, 1982, when he fell from a fire truck while en route to a fire as a fire fighter for the Village of Winthrop Harbor (the Village). In *Blagg I*, the Blaggs sued the manufacturers and the distributor of the fire truck; the manufacturers sued the Village for contribution; and the Village brought a fourth-party action for contribution against Bill. Bill was awarded permanent worker's compensation, and the Village asserted a worker's compensation lien against any award or settlement Bill might receive as a result of his lawsuit against the manufacturers and distributor, pursuant to section 5(b) of the Workers' Compensation Act. See Ill. Rev. Stat. 1987, ch. 48, par. 138.5(b) (now 820 ILCS 305/5(b) (West 1992)).

Under the settlement ultimately reached between the Blaggs and the defendants in Bill's suit, Bill was to receive $100,000 for his injuries and Marilyn was to receive $375,000 for loss of consortium.

Following a hearing, the trial court found that the settlement was entered in good faith and approved it, in accordance with the Contribution Act requirement that a settlement by a joint tort-feasor be in good faith (see Ill. Rev. Stat. 1987, ch. 70, par. 302(c) (now 740 ILCS 100/2(c) (West 1992))). The Village appealed, contending that the settlement allowed the parties to circumvent its lien against Bill's award by apportioning the bulk of the recovery to the loss of consortium claim. We found it inconceivable that Marilyn's loss could be three times as great as that of Bill. There was no basis in the record to support the allocation, and we agreed with the Village that the settlement constituted an attempt to evade the Village's lien. We reversed and remanded the matter for a new hearing. *Blagg I*, 186 Ill. App. 3d at 968.

The Blaggs successfully petitioned our supreme court for leave to appeal. In *Blagg v. Illinois F.W.D. Truck & Equipment Co.* (1991), 143 Ill. 2d 188, the court first concluded that the allocation of the settlement might have been reached so as to avoid the Village's lien. The court then held, as a matter of first impression, that recovery for loss of consortium is limited by the comparative negligence of the physically injured spouse. In accord with its conclusions and pronouncement of a new legal principle, the *Blagg* court remanded the cause to the trial court for reexamination, this time with the Village's worker's compensation lien in mind and with consideration being given to Bill Blagg's comparative negligence.

Upon remand, petitioner filed a petition to intervene as subrogee of the Village, and the plaintiffs' motion to strike and dismiss the petition was denied. A new settlement allocation, which divided the settlement proceeds of $475,000 equally between Marilyn and Bill, was proposed to the trial court. Following a hearing, the court again found that the allocation was in good faith and dismissed the cause with prejudice. Petitioner appeals from the trial court's good-faith determination, and plaintiffs cross-appeal from the order denying their motion to strike the petition to intervene.

Focusing on *Blagg I*, petitioner claims the trial court used the wrong standard in evaluating the allocation of the settlement proceeds. In *Blagg I* the trial court had also approved the settlement based on a finding that it was entered in good faith. We held, however, that regardless of whether the court might find it to be in good faith, the trial court must closely scrutinize the settlement to determine whether the allocation is fair and reasonable, keeping in mind that the employer's lien must be protected, as required by section 5(b) of the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.5(b) (now 820 ILCS 305/5(b) (West 1992))). Close

scrutiny by the trial court would assure that the employer was not deliberately and unfairly denied its statutory right to recover due to an allocation inconsistent with the employee's injuries. We relied heavily on *Page v. Hibbard* (1987), 119 Ill. 2d 41, where the court had remanded the case for a determination of whether the recovery for loss of consortium, which equaled the amount awarded to the spouse for his injuries, was " 'fair and reasonable in light of the total settlement' " (*Blagg I*, 186 Ill. App. 3d at 960, quoting *Page*, 119 Ill. 2d at 50). We urged that the trial court should consider whether the parties would have allocated the settlement the same way had there not been a worker's compensation lien.

In the appeal of *Blagg I* the supreme court noted that the trial court had focused almost exclusively on the good-faith requirement and virtually ignored the statutory obligation to protect the employer's lien. Stating that such protection is of "utmost importance," the supreme court repeated that the lower court must closely scrutinize the agreement so that an employer's rights are not abused. In sum, then, the issues now before us are whether, in light of the importance of protecting the employer's lien, the trial court adequately examined the settlement involved here and whether the court properly approved the settlement.

It is true, as petitioner points out, that the trial court used "good faith" language in rendering its judgment. However, our examination of the record, including the court's remarks in their entirety, reveals that the lower court understood and followed the standard imposed by *Blagg I*. At the start of proceedings upon remand, both counsel indicated that, if the court did not find their newly proposed allocation of settlement proceeds acceptable, they would be receptive to any allocation the court would find satisfactory. The trial judge responded to the parties' suggestion by saying he did not think the legislature or the reviewing courts had ever contemplated such a role for the trial court, but that all the lower court could do was find a good-faith settlement or not. The judge then added:

"And frankly, I don't think Blagg changes that, [Blagg] just called it to the attention of the court that in making a determination about a good faith settlement, that there is a particular responsibility to protect the workmen's comp lein [*sic*] rights. And in order to do that, one must very closely scrutinize what is presented to the court in making a determination of what a good faith settlement is. So, I'm not sure that that portion of [Blagg] really substantially changes the law, except to the extent that the tradition, the strength of the traditional presumptions may [be] put [to] a stronger test *** or [there may be] less of a strength in the presumptions of good faith, simply by entering into an agreement."

Again, at the time of closing argument, the trial judge engaged in a dialog with both counsel regarding the nature of the determination he was about to make. Although the judge stated that the issue was whether the allocation figures presented good-faith figures, the directives of *Blagg I* were reflected in the following discussion between the court and counsel for petitioner:

"THE COURT: \*\*\* [T]here is a strong public policy, am I protecting your rights, number one.

\*\*\*

MR. GOLDEN: Right.

THE COURT: The question is whether their settlement is, considering that fact, their settlement is in good faith.

MR. GOLDEN: Right."

In a later dialog about the burden of proof, the court again alluded to the requirements established in *Blagg I*, as follows:

"[T]hat is what I really think changes by Blagg.

\* \* \*

\*\*\* The standard of how I look at the facts and the presumption [of good faith], and the rest, has changed [due to] the requirement of a particularly close scrutiny, being mindful of my obligations to the comp carrier."

Finally, when announcing his decision, the trial judge once again recognized his obligations under *Blagg I* when he said,

"And I have given this great scrut—close scrutiny, and I have considered the very strong public policy and rights of the comp carrier."

The trial judge's own comments, both before and after the evidentiary hearing, leave no doubt in our minds that he applied the correct standard in examining the parties' allocation. We are confident that the court's awareness of the great importance of protecting the employer's right to reimbursement prompted the level of careful scrutiny called for in *Blagg I*. It remains to be decided whether the trial court properly determined that the allocation withstood that scrutiny and merited approval.

●1 The evaluation of the good-faith nature of settlements is within the discretion of the trial court, which is in the best position to make such a decision, and the lower court's determination will not be disturbed absent an abuse of its discretion. (*Johnson v. Belleville Radiologists, Ltd.* (1991), 221 Ill. App. 3d 100, 111-12.) While the standard applicable to this case goes beyond a determination of good faith (see *Blagg I*, 186 Ill. App. 3d at 963), we see no reason why it should not also be within the trial court's discretion to evaluate the fairness and reasonableness of the parties' allocation of settlement proceeds. Our review of the record reveals no abuse of discretion.

The testimony at the evidentiary hearing revealed that Bill, who was then 64 years old, had suffered very serious injuries which left him in a coma for more than two months. Numerous doctors treated him for numerous complications. At one point he underwent back surgery and, at another time, had skin grafts to repair ulcers which developed on his leg. The ulcer condition continued to give him difficulty. Extensive physical therapy enabled him to walk again, but only on a limited basis. He was left with a permanent foot drop and was still quite unstable. Bill suffered a great deal of pain, experienced a loss of mental acuity and severe sleep disturbances, and took medication for ongoing depression which set in after the accident. He had been unable to work for 10 years, and no longer participated in community or local government affairs, even though he had been a very active citizen before he was injured. While he had done some volunteer work for the Village, he could not be on his feet for more than two or three hours at a time and could do only minor tasks.

The injuries sustained by Marilyn were also sharply delineated at the hearing. Marilyn was 63 years old at the time of the hearing and had been married to Bill for 44 years. Bill was taken to the hospital right after the accident and stayed there for roughly $2^1/_2$ months. Marilyn was there with him all day every day and late into the night. Even after she went home, she was often called back for different complications. Marilyn testified that Bill was not personally aware of what had occurred during the two months he was in a coma. During that time the doctors surgically had to open Bill's chest and insert a tube to drain infection from his lung. Although Bill did not even know when the procedure had been done, Marilyn did because she had been called at 4 or 5 o'clock in the morning.

Bill came directly home from the hospital, and Marilyn cared for him there without any live-in help or nursing assistants. Inasmuch as Bill was completely incapacitated at first, Marilyn did everything for him, including taking him to physical therapy five days a week and putting him in his wheelchair. Marilyn said that for the first five years after the accident she stayed almost exclusively in the house with her husband. By the time of the hearing Bill was able to talk and communicate with people, dress himself, and drive a car by himself. However, Bill testified that his memory was terrible and that Marilyn put his medication out every day so he would know what he should take.

As a result of his injuries, Bill was no longer able to participate in the heating and air conditioning business he owned, so he sold it. Several years after the accident Marilyn tried working as a realtor but had sold only four or so houses. The couple's annual income had

been reduced from $39,520 plus a car, to the $17,722 they received from worker's compensation. Too, Bill could no longer do many things around the house, so Marilyn now hired people for tasks such as painting, carpentry, and car maintenance.

The couple's very active and involved social life had dwindled to almost nothing. They went out to dinner once a week or so but always by themselves. If Bill could no longer do a social activity, Marilyn did not do it, either. Bill testified that Marilyn often wanted to attend social functions, but did not do so because he either could not participate or did not feel like doing so.

While they previously had had frequent sexual relations, Bill had not been able to have such relations with Marilyn during the 10 years since the accident. Nor, according to Marilyn, was there much of the affection that used to go on in the marriage. Before he was injured Bill had been likeable, nice, easygoing, and very stable emotionally. Marilyn described herself as being the more hot tempered of the two. Now Bill was a different person. Because he did not always understand what was being talked about, he would misconstrue Marilyn's statements, and she had to be very careful of what she said. Bill had become very moody and would get irritable, something he had never done before. Also, apparently as a result of a disturbed sleep pattern, Bill would thrash in his sleep. Since Marilyn always slept in the same bed with her husband, she had been wakened four or five times every night since Bill had come home from the hospital. When asked why she had not gone to another bedroom, Marilyn said she felt more comfortable having Bill near her and was just glad he was around.

After proofs were closed, the trial court commented several times that it found both Marilyn and Bill to be very believable, very credible people. Also, in attempting to assess the impact of the emotional loss to both plaintiffs, the court related its impression that by his very nature Bill was a somewhat phlegmatic, accepting person, while Marilyn experienced more of a reaction to things. Having reviewed the report of proceedings, we opine that the court's findings regarding the plaintiffs are consistent with the manifest weight of the evidence.

Petitioner insists that the damages suffered by Marilyn pale in significance compared to the devastating injuries sustained by Bill and that the 50-50 allocation, therefore, is not fair. However, the trial court remarked, and the record is persuasive, that, even though Marilyn did not experience the physical injuries and pain that were suffered by Bill, the personal, emotional impact of what had occurred was at least as significant for her as it was for her husband.

For over two months Marilyn stayed at Bill's bedside, watching him undergo one medical procedure after another, not knowing if he would ever wake up. Bill, on the other hand, had no recollection of those two months. When Bill did go home, Marilyn not only took complete care of him physically, but she also had to deal with the depression and personality changes and frustration which accompanied his long rehabilitation. The couple's lifestyle changed dramatically, both financially and socially, and they no longer enjoyed a sexual relationship. Judging from the respective natures or personalities of Bill and Marilyn as revealed through their testimony and observed by the trial court, we believe Marilyn might have felt these terrible losses more keenly than Bill, even if Bill had been fully alert. It must be remembered, however, that Bill had also lost some measure of mental acuity and may have been even further insulated from the psychic pain of his and Marilyn's situation.

●2 To summarize, we believe, as did the lower court, that, with regard to the impact on her quality of life, Marilyn suffered every bit as much as Bill. In *Blagg I* we commented, but did not impose a requirement for a finding, that the trial court should consider whether the parties would have allocated the settlement the same way had there not been a worker's compensation lien. The lower court here did not address this particular consideration. However, under the circumstances of this case, we think the parties might very well have reached precisely the same allocation even if there had been no lien. Hence, we conclude that, even upon close scrutiny of Bill and Marilyn's respective injuries, the allocation of half the total award to Marilyn was fair and reasonable and that approval of the allocation, therefore, was a proper exercise of the trial court's discretion.

We find support for the conclusion we reach in *Diminskis v. Chicago Transit Authority* (1987), 155 Ill. App. 3d 585. In *Diminskis* the court affirmed a jury award of $400,000 to the injured husband and $400,000 to the wife for loss of consortium. The husband in *Diminskis* suffered a severe brain injury in the accident and, two years later, was declared incompetent. His wife testified that, prior to the accident, her spouse had been active in a number of ethnic organizations and had been an active gardener, but he no longer did those activities. She also related his physical and emotional condition during his recovery and indicated that their relationship now was very different from the pleasant one they had enjoyed before the accident. The trial court had correctly found that the husband's ability to recollect details of the accident rendered his testimony inadmissible. Based on this record the *Diminskis* court addressed the issue of whether the wife's award was excessive as follows:

"In determining whether an award is excessive, the test to be used is 'whether it [the award] falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience.' (*Northern Trust Co. v. County of Cook* (1985), 135 Ill. App. 3d 329, 334 \*\*\*.)" (*Diminskis*, 155 Ill. App. 3d at 593.)

The court then indicated that, in light of the spouses' relationship before and after the accident, and the husband's present condition, it could not find that the award to the wife was shocking to the conscience.

While the injuries sustained by Bill Blagg were clearly severe and debilitating, it does not appear they were nearly so devastating as those suffered by the husband in *Diminskis*. Unlike Bill Blagg, the injured spouse in *Diminskis* was declared to be mentally disabled and was incompetent even to testify at trial. While *Diminskis* does not provide much detail regarding the role played by the wife in the aftermath of the husband's accident and injury, we suspect from the facts related in the opinion that, in many ways, it was similar to the role assumed by Marilyn in this case. In light of *Diminskis*, the amount of the allocation to Marilyn is not shocking to our collective judicial conscience. On the contrary, we think it falls within the " 'flexible limits of fair and reasonable compensation.' " *Diminskis*, 155 Ill. App. 3d at 593, quoting *Northern Trust*, 135 Ill. App. 3d at 334.

Lest it be protested that the injured spouse's award in *Diminskis* was not subject to a worker's compensation lien and the allocation, therefore, was not given the scrutiny required by *Blagg I*, we hasten to add that we acknowledge this difference between *Diminskis* and this case. Nevertheless, the *Diminskis* court did focus on whether the award to the wife fell within the limits of "fair and reasonable" compensation. *Blagg I* also calls for a determination whether an allocation is fair and reasonable. While it is not dispositive, *Diminskis* certainly is helpful in evaluating the trial court's exercise of discretion on this point.

●3 We now turn briefly to plaintiffs' cross-appeal. Plaintiffs claim the trial court erred when it denied their motion to strike and dismiss the petition to intervene. Citing the Village's fourth-party complaint against Bill, which alleged that Bill was largely responsible for his own injuries, the motion asserted that the Village had effectively frustrated plaintiffs' chances of recovery against the manufacturer and distributor of the fire truck. Plaintiffs concluded that, through this conduct the petitioner, as subrogee of the Village, had waived its right to reimbursement. Plaintiffs also raised this issue in the prior

appeal (see *Blagg I*, 186 Ill. App. 3d at 967) and supported it with the same argument, based on unfairness, which they make here. We resolved this point against plaintiffs in *Blagg I*, but the supreme court did not address it, noting only that it had not been raised in the circuit court. In this appeal it is clear that the matter was brought to the attention of the court below. However, since plaintiffs present nothing new in the way of substance or argument, we need not address the issue, but merely abide by our previous disposition.

In accord with the reasons stated, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

DOYLE and QUETSCH, JJ., concur.